**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
SYLVIA QUINTERO,

                              Plaintiff,                    **REPORT AND**
                                                           **RECOMMENDATION**

              -against-                                     **19-CV-6126 (DG)**

ANGELS OF THE WORLD, INC. and
GEORGE STOUPAS,

                              Defendants.
-------------------------------------------------------------x

**ROANNE L. MANN, UNITED STATES MAGISTRATE JUDGE:**

    In this employment-related action, plaintiff Sylvia Quintero ("plaintiff") sues her former

employers, defendants Angels of the World, Inc. ("Angels of the World"), and George Stoupas

("Stoupas") (collectively, "defendants"), alleging claims for racial and sexual discrimination and

retaliatory discharge under 42 U.S.C. § 1981 *et seq.* ("Section 1981"), Title VII of the Civil Rights

Act of 1964, 42 U.S.C. § 2000e ("Title VII"), the New York State Human Rights Law, N.Y. Exec.

Law § 290 *et seq.* ("NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin.

Code § 8-107 ("NYCHRL").   See generally Complaint (Oct. 30, 2019) ("Compl."), Electronic

Case Filing ("ECF") Docket Entry ("DE") #1.[1]   Currently pending before this Court, on a referral

from the Honorable Diane Gujarati, is plaintiff's motion for default judgment.   See Motion for

Default Judgment (Mar. 1, 2021) ("Mot. for Default J."), DE #25; Order Referring Motion (Mar.

2, 2021).

    For the reasons that follow, this Court recommends that the District Court grant plaintiff's

motion for default judgment in large part as discussed below.

---

[1] After the Court issued an order identifying pleading deficiencies related to plaintiff's Fair Labor Standards Act and
New York Labor Law claims, see Scheduling Order (July 7, 2021) ("7/7/21 Scheduling Order") at 1-2, DE #35, plaintiff
voluntarily dismissed without prejudice her wage-and-hour claims (i.e., the Eighth through Twelfth Causes of Action),
see Letter Response to the Court's July 7, 2021 Order (July 14, 2021), DE #36.

## BACKGROUND

On October 30, 2019, plaintiff commenced this action, asserting various causes of action arising out of her employment with defendants.  See Compl.  Plaintiff is an African-American woman who worked at defendants' "gentlemen's club" as an "Entertainer" or exotic dancer, from December 2014 to October 25, 2017.  See id. ¶¶ 3 n.1, 9-11, 21.  Plaintiff worked exclusively for tips and did not receive any wages from defendants.  See id. ¶ 22.  Defendants required plaintiff to pay them "housing fees," ranging from $80 to $300 per night, depending on the shift she worked. See id. ¶ 23.

In December 2015, defendants began to highlight the presence of bartenders, whom they called "Startenders," and instructed them to wear the same or similar types of attire as Entertainers, and to engage in stripteases and exotic nude dancing.  See id. ¶ 25.  The Startenders hired by defendants were exclusively Latina and lighter-skinned women, in contrast to plaintiff, and other Entertainers, who were darker-skinned African-American women.  See id. ¶ 26.  Plaintiff alleges that management began to feature the Startenders because defendants perceived lighter-skinned women to be more desirable to customers than darker-skinned women.  See id. ¶ 27.

Although defendants directed customers to tip Startenders directly, they instructed customers that all tips for Entertainers must be thrown onto the stage, so that the money could be collected by defendants, and redistributed to the Entertainers, and to other of defendants' employees, at defendants' discretion.  See id. ¶ 28; see also id. ¶ 31.  Plaintiff and other Entertainers were prohibited from meeting with customers in semi-private VIP areas, which were generally reserved for Startenders.  See id. ¶ 29.  Unlike the Entertainers, the Startenders were not required to pay a housing fee.  See id. ¶ 32.  Defendants designated the club's more popular nights as "Latina Nights," during which plaintiff was not permitted to work.  See id. ¶ 33.  Plaintiff further alleges

that she was subjected to racial slurs by "defendants," but does not identify the managers or employees to whom she refers.  See id. ¶ 34 (plaintiff and other darker-skinned Entertainers were called "Monkeys" and "Zoo Animals").

In addition to the ongoing racial discrimination, defendants fostered an environment of sexual harassment and quid pro quo harassment by managers and promoters.[2]  See id. ¶ 36. Plaintiff was subjected to a pattern and practice of quid pro quo sexual harassment by the managers and promoters.  See id. ¶ 39.  Specifically, in 2017, defendant Stoupas, who managed the day-to-day operations of Angels of the World, began making sexually explicit comments and requests towards plaintiff.  See id. ¶¶ 14, 44.  Stoupas also "frequently directed Entertainers and Startenders downstairs to his private office to engage in sexual activities with him."  Id. ¶ 42.  One promoter, known as "Strike Sinatra," sexually harassed plaintiff on a regular basis by demanding sexual favors from her via phone and text message.  See id. ¶ 47.  Other promoters also demanded that plaintiff have sex with them.  See id. ¶ 48.  Because plaintiff did not submit to these unwanted sexual advances, she received fewer and less lucrative shifts than other dancers, and therefore less compensation.  See id. ¶ 49.

In October 2017, plaintiff began to speak publicly about defendants' racial discrimination towards the African-American Entertainers.  See id. ¶¶ 35, 50.  Plaintiff's advocacy started a movement designated as the "NYC Stripper Strike," which garnered significant media attention. See id. ¶ 50 & n.3.  On or about October 24, 2017, a promoter known as "King Keno," who worked for defendants, created an Instagram page entitled "dancersarefried," in which King Keno, as well as other Angels of the World employees, posted comments describing plaintiff as

---

[2] In addition to marketing and promotional duties, the promoters exercised managerial/supervisory authority over Entertainers, including the ability to hire and fire Entertainers, and the authority to reduce their hours and their share of tips.  See Compl. ¶ 36 n.2.

"ignorant," "a fraud," a "fake bitch," insulted her appearance, shared offensive and altered images of plaintiff, and called for plaintiff's termination.  See id. ¶¶ 52-53.  On October 25, 2017, during a radio interview in which plaintiff discussed "defendants' racist treatment of their employees," id. ¶ 54, King Keno called in and denied plaintiff's allegations and continued his attacks against her on-air, see id. ¶ 55.  As a result of defendants' alleged retaliation, plaintiff was afraid to return to work and was forced to quit.  See id. ¶¶ 56, 57.

## PROCEDURAL HISTORY

Plaintiff filed her Title VII charges with the Equal Employment Opportunity Commission ("EEOC") on August 16, 2018, and was granted the right to sue on August 2, 2019.  See id. ¶¶ 7-8.  Plaintiff filed her federal complaint against defendants on October 30, 2019.  See Compl. Plaintiff effected service on the corporate defendant through the New York Secretary of State on July 9, 2020, and served defendant Stoupas on June 29, 2020.  See Summons Returned Executed (July 2, 2020), DE #13; Summons Returned Executed (July 14, 2020), DE #14.  By Order dated October 28, 2020, after plaintiff failed to take any action beyond service of process, this Court directed plaintiff to show cause why the case should not be dismissed for lack of prosecution, pursuant to Rule 41(b) of the Federal Rules of Civil Procedure, and for failure to effect timely service, pursuant to Rule 4(m).  See Order to Show Cause (Oct. 28, 2020), DE #15.  Although the Court found that plaintiff had not shown good cause for her delay, the Court exercised its discretion to extend the deadline for serving defendants, *nunc pro tunc*, to July 30, 2020.  See Order (Nov. 5, 2020).

On December 7, 2020, plaintiff requested a certificate of default.  See Request for Certificate of Default (Dec. 7, 2020), DE #23.  The Clerk of Court noted defendants' default on December 14, 2020.  See Clerk's Entry Of Default (Dec. 14, 2020), DE #24.  On March 1, 2021,

plaintiff moved for default judgment, <u>see</u> Mot. for Default J., and subsequently supplemented her motion at the Court's direction, <u>see</u> Letter Response (July 14, 2021) ("7/14/21 Letter"), DE #36. Counsel mailed defendants copies of plaintiff's motion for default judgment, <u>see</u> Affidavit of Service (Mar. 5, 2021), DE #28, and communicated with an attorney representing them in another matter, thereby ensuring that they had actual notice of this lawsuit, <u>see</u> Affirmation of Susan K. Crumiller (Mar. 1, 2021) ("Crumiller Aff.") ¶¶ 9-17, DE #25-1 & Exs. A-F thereto.    Defendants nevertheless have not responded to the motion.

## DISCUSSION

### I.    Default Judgment Standard

After the Clerk of the District Court enters a Certificate of Default, the District Court may, on a plaintiff's application, enter a default judgment where a defendant "has failed to plead or otherwise defend" an action.    <u>See</u> Fed R. Civ. P. 55(a), (b); <u>see also</u> S.D.N.Y./E.D.N.Y. Local Civ. R. 55.2(b).    A defendant's default constitutes an admission of all well-pleaded factual allegations in the complaint except those relating to damages.    <u>See</u> <u>Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.</u>, 973 F.2d 155, 158 (2d Cir. 1992); <u>Au Bon Pain Corp. v. Artect, Inc.</u>, 653 F.2d 61, 65 (2d Cir. 1981).    Nevertheless, a pleading's legal conclusions are not assumed to be true, and, on a motion for default judgment, the factual allegations in the complaint must themselves be sufficient to establish a right to relief.    <u>See</u> <u>City of New York v. Mickalis Pawn Shop, LLC</u>, 645 F.3d 114, 137 (2d Cir. 2011); <u>Finkel v. Romanowicz</u>, 577 F.3d 79, 84 (2d Cir. 2009) (district court is "required to determine whether the [plaintiff's] allegations establish [defendant's] liability as a matter of law"); <u>Chen v. JP Standard Constr. Corp.</u>, 14-CV-1086 (MKB), 2016 WL 2909966, at *4 (E.D.N.Y. Mar. 18, 2016), <u>adopted</u>, 2016 WL 2758272 (E.D.N.Y. May 12, 2016).    "When deciding a [defendant's liability on a] motion for default judgment, courts have also looked to recent

precedent with regard to surviving a Rule 12(b)(6) motion to dismiss[.]"  Chanel, Inc. v. Jean-Louis, No. 06-cv-5924 (ARR)(JO), 2009 WL 4639674, *3 (E.D.N.Y. Dec. 7, 2009).

If the allegations in the pleading properly state a claim, the plaintiff must then establish damages.  See Greyhound Exhibitgroup, 973 F.2d at 158.  It is within a court's discretion to determine whether the plaintiff's burden has been met, and whether or not to hold an evidentiary hearing on the issue of damages.  See Tamarin v. Adam Caterers, Inc., 13 F.3d 51, 53-54 (2d Cir. 1993); Action S.A. v. Marc Rich & Co., Inc., 951 F.2d 504, 508 (2d Cir. 1991); Fed. R. Civ. P. 55(b)(2).  In this regard, the moving party is entitled to all reasonable inferences from the evidence it offers.  See Romanowicz, 577 F.3d at 84; Au Bon Pain, 653 F.2d at 65.

## II.    Statute of Limitations

In New York, an employment discrimination claim under Title VII must be filed with the EEOC within 300 days of the alleged discrimination.  See Russo v. N. Y. Presbyterian Hosp., 972 F.Supp.2d 429, 442 (E.D.N.Y. 2013).  The statute of limitations under the NYSHRL and the NYCHRL is three years.  See Taylor v. City of New York, 207 F.Supp.3d 293, 301-02 (S.D.N.Y. 2016); N.Y. C.P.L.R. § 214(2); N.Y.C. Admin. Code § 8–502(d).  "The statute of limitations for claims under [Section] 1981 is either three years or four years, depending on the nature of the claims[,]" with the four-year period applicable to claims that arise out of a post-1990 statute (28 U.S.C. § 1658) that created a federal "catch-all" statute of limitations.  See Johnson v. Wendy's Corp., 1:19-cv-8157-MKV, 2021 WL 243055, at *4 (S.D.N.Y. Jan. 25, 2021) (citing, inter alia, Jones v. R.R. Donnelly & Sons Co., 541 U.S. 369, 382 (2004)).  Plaintiff's Section 1981 hostile work environment and retaliation claims, which "allege discrimination and retaliation arising after her employment relationship with defendants was formed," "arise under section 1981(b), which was enacted as part of the 1991 amendment to section 1981[,]" and thus "are subject to the four-year

federal 'catch-all' statute of limitations established by 28 U.S.C. § 1658(a)." Hayes v. Kerik, 414 F.Supp.2d 193, 208 (E.D.N.Y. 2006).

Accordingly, plaintiff's retaliation and discrimination claims under Title VII, as well as any damages arising from those claims, would be time-barred (1) under Title VII if they arose prior to October 20, 2017; (2) under the NYSHRL and NYCHRL if they arose prior to October 20, 2014; and (3) under Section 1981 if they arose prior to October 20, 2013.  Here, however, defendants have waived the statute of limitations as an affirmative defense by failing to appear in this action. See S.E.C. v. Amerindo Inv. Advisors, 639 F.App'x 752, 754 (2d Cir. 2016) ("the statute of limitations defense was abandoned by their failure to appear and assert that defense"); Doe v. Constant, 354 F.App'x 543, 545 (2d Cir. 2009) (affirming entry of default judgment and noting that "timeliness . . . is an affirmative defense that may be forfeited or waived"); Kropelnicki v. Siegel, 290 F.3d 118, 130 n.7 (2d Cir. 2002) ("The statute of limitations is an affirmative defense that is waived if not raised. As a result, we have held that 'a district court "ordinarily" should not raise a statute of limitations defense *sua sponte*.'") (citations omitted).

In any event, the continuing violation doctrine allows a plaintiff "to bring suit challenging all conduct that was a part of that [continuing] violation, even conduct that occurred outside the limitations period." Cornwell v. Robinson, 23 F.3d 694, 704 (2d Cir. 1994).  To demonstrate that the doctrine applies, the plaintiff is required to show that the related acts were the result of a discriminatory policy rather than isolated instances of discrimination.  See Patterson v. Cnty. of Oneida, N.Y., 375 F.3d 206, 220 (2d Cir. 2004) ("To bring a claim within the continuing violation exception, a plaintiff must at the very least allege that one act of discrimination in furtherance of the ongoing policy occurred within the limitations period."); Fitzgerald v. Henderson, 251 F.3d 345, 359 (2d Cir. 2001); Cornwell, 23 F.3d at 704.  To the extent plaintiff's claims arise out of conduct

7

that would otherwise be beyond the applicable limitations period, plaintiff alleges that defendants'
discriminatory conduct was part of a continuing policy and practice that culminated in her
constructive discharge on or about October 27, 2017.[3]  Thus, having filed her EEOC complaint on
August 16, 2018, all of plaintiff's claims are timely pursuant to the "continuing violation doctrine."

## III.    Racial Discrimination under Title VII, NYSHRL, NYCHRL and Section 1981

Plaintiff alleges that defendants discriminated against her and subjected her to a hostile work
environment based on her race, in violation of Title VII, the NYSHRL, the NYCHRL and Section
1981.  Title VII of the Civil Rights Act of 1964 provides that "[i]t shall be an unlawful employment
practice for an employer . . . to discriminate against any individual with respect to [her]
compensation, terms, conditions, or privileges of employment, because of such individual's race
[or] color[.]"  42 U.S.C. § 2000e-2(a)(1).  Similarly, the NYSHRL provides that "[i]t shall be an
unlawful discriminatory practice [f]or an employer," on account of an individual's race, creed or
color, "to discriminate against such individual in compensation or in terms, conditions or privileges
of employment."  N.Y. Exec. Law. § 296(1)(a).  Section 1981 "outlaws [racial] discrimination
with respect to the enjoyment of benefits, privileges, terms and conditions of a contractual
relationship, such as employment[.]"  Patterson, 375 F.3d at 224 (citation omitted).  "Most of the
core substantive standards that apply to claims of discriminatory conduct in violation of Title VII are
also applicable to claims of discrimination in employment in violation of § 1981[,]" id. at 225, as
well as to those brought pursuant to the NYSHRL, see Vivenzio v. City of Syracuse, 611 F.3d 98,
106 (2d Cir. 2010).[4]  In contrast, the NYCHRL was intended to be construed more broadly than its

---

[3] Plaintiff's constructive discharge claims were in any event filed within the applicable statutes of limitations.

[4] As discussed below, "[t]he principal difference[] among these three statutes" is that individuals may not be held liable
under Title VII.  See Turley v. ISG Lackawanna, Inc., 774 F.3d 140, 156 n.6 (2d Cir. 2014).  In addition, Title VII
requires that defendants had "fifteen or more employees for each working day in each of twenty or more calendar weeks

state and federal counterparts, see Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 109 (2d Cir. 2013); Bermudez v. City of N.Y., 783 F.Supp.2d 560, 579 (S.D.N.Y. 2011), and, "if Plaintiffs meet the requisite elements of their claims under either Title VII or Section 1981, the standard under the NYCHRL is also met[,]" Francis v. Ideal Masonry, Inc., 16-CV-2839 (NGG)(PK), 2018 WL 4292171, at *4 (E.D.N.Y. Aug. 3, 2018), adopted, 2018 WL 4288625 (E.D.N.Y. Sept. 7, 2018).

Plaintiff alleges that because of her race, she both suffered adverse employment actions and was subjected to a hostile work environment. Addressing each of these two theories in turn, the Court first considers whether plaintiff has sufficiently alleged a federal or state cause of action against her employer, Angels of the World, and then turns briefly to her municipal claims and to whether she has stated a claim against her supervisor, defendant Stoupas.

A. *Adverse Race-Based Employment Actions by Angels of the World (Federal and State Claims)*

"Employment discrimination claims [alleging adverse employment action on the basis of race] brought under Title VII, [Section] 1981, and the NYSHRL are analyzed pursuant to the burden-shifting framework established by the Supreme Court in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973)." Spires v. MetLife Grp., Inc., No. 18-CV-4464 (RA), 2019 WL 4464393, at *4 (S.D.N.Y. Sept. 18, 2019); see Littlejohn v. City of New York, 795 F.3d 297, 312 (2d Cir. 2015)

---

in the current or preceding calendar year," see 42 U.S.C. § 2000e(b), which plaintiff's Complaint fails to allege explicitly. Nevertheless, the Court infers that Angels of the World employed at least fifteen individuals based on the nature of the business, the issuance of a right-to-sue letter by the EEOC, and plaintiff's allegations referencing various categories of employees, including managers, bussers, disc jockeys, "house moms," promoters, Entertainers and Startenders. In any event, plaintiff's state and municipal claims do not have the same numerosity requirement and, if the Court were to recommend dismissing plaintiff's Title VII claims on that basis, it would recommend exercising supplemental jurisdiction over those claims and awarding the same damages. See Garcia v. Comprehensive Ctr., LLC, 17-CV-8970 (JPO) (BCM), 2019 WL 8274296, at *4 n.2 (S.D.N.Y. Nov. 21, 2019), adopted, 2020 WL 1435002 (S.D.N.Y. Mar. 24, 2020); Styka v. My Merchants Servs. LLC, 14 Civ. 6198 (ENV)(VMS), 2016 WL 3866550, at *3 (E.D.N.Y. July 13, 2016).

(applying this *McDonnell Douglas* framework to Title VII and § 1981 claims); McGill v. Univ. of Rochester, 600 F.App'x 789, 790 (2d Cir. 2015) (applying *McDonnell Douglas* framework with respect to claims brought under Title VII, § 1981, and the NYSHRL); Francis, 2018 WL 4292171, at *5. Under the *McDonnell Douglas* framework, to make a prima facie showing of disparate treatment under Title VII, a plaintiff must assert four necessary elements: "(1) that she is a member of a protected class; (2) that she was qualified for employment in the position; (3) that she suffered an adverse employment action; and, in addition, has (4) some minimal evidence suggesting an inference that the employer acted with discriminatory motivation[.]" Littlejohn, 795 F.3d at 307. "[W]hile a discrimination complaint need not allege facts establishing each element of a prima facie case of discrimination . . . , it must at a minimum assert nonconclusory factual matter sufficient to nudge its claims across the line from conceivable to plausible to proceed." EEOC v. Port Auth. of N.Y. & N.J., 768 F.3d 247, 254 (2d Cir. 2014) (internal citations and quotations omitted); see Littlejohn, 795 F.3d at 311. Specifically, "absent direct evidence of discrimination, what must be plausibly supported by facts alleged in the complaint is that the plaintiff is a member of a protected class, was qualified, suffered an adverse employment action, and has at least minimal support for the proposition that the employer was motivated by discriminatory intent." Littlejohn, 795 F.3d at 311.

Plaintiff alleges that she is African-American, and, therefore, belongs to a protected class. See Compl. ¶ 9. Since plaintiff worked for defendants for approximately three years, the Court infers that she was qualified for her job. See id. ¶¶ 21, 54-57. Plaintiff alleges that she was treated differently than the Latina Startenders, who were allowed to work more shifts, on more lucrative nights, and were not required to pay defendants a housing fee, which all resulted in a significant diminution in her earnings. See id. ¶¶ 28-33. Moreover, defendants made several

bigoted comments directed at plaintiff's race, including at least one comment that was directly related to the disparate treatment alleged by plaintiff. See id. ¶¶ 34-35 (in response to plaintiff's complaints of favorable treatment towards Latinas, one promoter told her: "You're just jealous they look better than you, go back to the Bronx Zoo."). These circumstances give rise to an inference of racial discrimination. See Francis, 2018 WL 4292171, at *5; Klings v. N.Y.S. Office of Court Admin., No. 04-CV-3400 (KAM)(LB), 2010 WL 1292256, at *15 (E.D.N.Y. Apr. 5, 2010) ("[S]upervisors' remarks may be probative of a discriminatory motive when they describe why a decision was made."). Since plaintiff has alleged facts sufficient to establish a prima facie case of discrimination on the basis of race, the burden shifts to defendants to present a legitimate, non-discriminatory reason for the termination. Because defendants have defaulted, they have not rebutted plaintiff's prima facie case, which thus rests on factual allegations that stand undisputed. See Taylor v. New York City Fresh Mkt., 19 CV 4797 (EK)(LB), 2020 WL 10356230, at *7 (E.D.N.Y. Dec. 23, 2020), adopted, 2021 WL 2940832 (E.D.N.Y. July 13, 2021); Francis, 2018 WL 4292171, at *6.

B.    *Angels of the World's Hostile Work Environment (Federal and State Claims)*

A hostile work environment is one form of disparate treatment on the basis of race that is prohibited under Title VII. See Raniola v. Bratton, 243 F.3d 610, 617 (2d Cir. 2001); see also Feingold v. New York, 366 F.3d 138, 149 (2d. Cir. 2004). "To state a claim for hostile work environment in violation of Title VII, a plaintiff must plead facts that would tend to show that the complained of conduct: (1) 'is objectively severe or pervasive - that is, . . . creates an environment that a reasonable person would find hostile or abusive'; (2) creates an environment 'that the plaintiff subjectively perceives as hostile or abusive'; and (3) 'creates such an environment because of the plaintiff's [race].'" Patane v. Clark, 508 F.3d 106, 113 (2d Cir. 2007) (per curiam) (quoting

11

Gregory v. Daly, 243 F.3d 687, 691–92 (2d Cir. 2001)); see Rasmy v. Marriott Int'l, Inc., 952 F.3d 379, 387 (2d Cir. 2020).   "For liability to attach, the employer must also be responsible for the conduct at issue."   Gregory, 243 F.3d at 692 n.3.   Again, the same substantive standards also apply to hostile work environment claims arising under the NYSHRL and under Section 1981.   See Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11, 20 n.4 (2d Cir. 2014).

Ordinarily, a race-based hostile work environment claim must involve "'more than a few isolated incidents of racial enmity[.]'"   Williams v. Cnty. of Westchester, 171 F.3d 98, 100–01 (2d Cir. 1999) (per curiam) (quoting Snell v. Suffolk Cnty., 782 F.2d 1094, 1103 (2d Cir. 1986)).   An isolated incident can, however, constitute a hostile work environment if it is sufficiently severe. See Feingold, 366 F.3d at 150.   "Otherwise, a plaintiff must show a series of incidents that were 'more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'"   Manswell v. Heavenly Miracle Acad. Servs., Inc., 14-CV-7114 (MKB) (SMG), 2017 WL 9487194, at *6 (E.D.N.Y. Aug. 23, 2017) (quoting Russo, 972 F.Supp.2d at 446-47), adopted, 2017 WL 4075180 (E.D.N.Y. Sept. 14, 2017).

Here, plaintiff alleges that she and other African-American Entertainers were "regularly called 'Monkeys' and 'Zoo Animals' from the 'Bronx Zoo.'"   See Compl. ¶ 34; see also id. ¶ 35. The Complaint also sufficiently alleges that plaintiff "subjectively perceived" the conditions of the workplace to be abusive and hostile, in that the racial harassment caused her "substantial emotional distress . . . , including intense stress and anxiety[.]"   Id. ¶ 59; see Tenecora v. Ba-kal Rest. Corp., CV 18-7311 (DRH) (AKT), 2020 WL 8771256, at *12 (E.D.N.Y. Nov. 30, 2020) ("[p]laintiffs asserted that they felt, among other things, 'anxious,' 'embarrassed,' 'demoralized,' 'uncomfortable,' and 'emotionally distressed' from the hostile and abusive conduct"), adopted in part, 2021 WL 424364 (E.D.N.Y. Feb. 8, 2021); Francis, 2018 WL 4292171, at *6 (plaintiffs

"subjectively" perceived the conditions of their employment as abusive where they alleged they felt they were "nobody" and "degraded").   Although plaintiff specifically identifies only one promoter who made racially derogatory comments (see Compl. ¶ 35), those remarks, coupled with plaintiff's more vague allegations of "severe and pervasive" comments by "defendants," state a plausible race-based hostile work environment claim against Angels of the World.   See Love v. Premier Util. Servs., LLC, 186 F.Supp.3d 248, 255 (E.D.N.Y. 2016) (in denying motion to dismiss, court finds that a jury "crediting [plaintiff's] general allegations could reasonably find pervasive harassment, even in the absence of specific details about each incident"); Crawford v. Natl. R.R. Passenger Corp., 3:15-CV-131 (JBA), 2015 WL 8023680, at *8 (D. Conn. Dec. 4, 2015) ("While several of Plaintiff's allegations are non-specific, such as his claims that 'white employees have repeatedly engaged in racially insensitive and, in some cases, obtrusive discriminatory behavior,' and that racially insensitive remarks, bigoted speech, and violent behavior towards African Americans have become the norm at Amtrak, '[i]f a jury were to credit [these] general allegations of constant abuse, . . . it could reasonably find pervasive harassment, even in the absence of specific details about each incident'") (internal citations omitted); see also Bell Atl. Corp. v. Twombly, 550 U.S. 544, 569 (2007) ("a complaint in an employment discrimination lawsuit need not contain specific facts establishing a prima facie case of discrimination under the framework set forth in *McDonnell Douglas*") (quoting Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508 (2002)).

      C.    *NYCHRL Race-Based Discrimination*

      To state a claim for race discrimination under the NYCHRL, a "plaintiff need only show differential treatment — that she is treated 'less well'— because of a discriminatory intent." Mihalik, 715 F.3d at 110 (quoting Williams v. N.Y. City Hous. Auth., 872 N.Y.S.2d 27, 39 (1st Dep't 2009)).   The NYCHRL does not distinguish between discrimination and hostile work

environment claims; rather, both are governed by N.Y.C. Admin. Code § 8–107(1)(a).  See Sotomayor v. City of N.Y., 862 F.Supp.2d 226, 261 (E.D.N.Y. 2012) ("Hostile work environment claims are analyzed under the same provision of the NYCHRL as discrimination claims.") (citation omitted).

Because plaintiff has adequately pled a claim for adverse employment actions and hostile work environment under Title VII, Section 1981, and the NYSHRL against Angels of the World, she has also done so under the NYCHRL.  See Francis, 2018 WL 4292171, at *4, *7 ("if Plaintiffs meet the requisite elements of their claims under either Title VII or Section 1981, the standard under the NYCHRL is also met"); Winston v. Verizon Servs. Corp., 633 F.Supp.2d 42, 48 (S.D.N.Y. 2009) (allegations that successfully state a claim under the NYSHRL "[a] fortiori . . . state[] a claim" under the NYCHRL, which "is more liberal than either its state or federal counterpart.") (citations omitted).

D.    *Race-Based Claims Against Defendant Stoupas*

Although corporations may be liable for discrimination under Title VII, the NYSHRL and Section 1981, there is no personal liability under Title VII.  See Francis, 2018 WL 4292171, at *4. Nevertheless, an individual defendant can be found liable under Section 1981 where individual liability is "'predicated on the [defendant's] personal involvement'" in intentional discrimination. See id. (quoting Tardd v. Brookhaven Nat'l Laboratory, 497 F.Supp.2d 404, 411-12 (E.D.N.Y. 2006)).  Under the NYSHRL, an individual may be held liable for his conduct in discriminating in the terms and conditions of employment if he is a supervisor who "'actually participates in the conduct giving rise to [the] discrimination.'"  Feingold, 366 F.3d at 157 (quoting Tomka v. Seiler Corp., 66 F.3d 1295, 1317 (2d Cir. 1995)); see Mandell v. Cnty. of Suffolk, 316 F.3d 368, 377 (2d Cir. 2003); EEOC v. Suffolk Laundry Servs., Inc., 48 F.Supp.3d 497, 523 (E.D.N.Y. 2014).

14

Individuals may likewise be held liable under Section 8-107(1)(a) of the NYCHRL "if they actually participated in the conduct giving rise to the discrimination claim." Dillon v. Ned Mgt., Inc., 85 F.Supp.3d 639, 658 (E.D.N.Y. 2015); see N.Y.C. Admin. Code §§ 8-107(1); Francis, 2018 WL 4292171, at *4.

In this case, the Causes of Action relating to race-based disparate treatment assert, without elaboration, that Stoupas was involved in and/or aided and abetted the discriminatory acts.[5]  The Complaint is equivocal as to whether Stoupas was an owner of Angels of the World, as opposed to an officer.  See Compl. ¶ 12.  Nevertheless, the pleading as a whole reflects that Stoupas, who "manage[d] the day-to-day operations" of the business, Compl. ¶ 14, and "determine[d] . . . [its] compensation policies[,]" id. ¶ 15, was responsible for "creat[ing] the racial caste system" of which plaintiff complains, id. ¶ 31, and thus is individually liable for racial discrimination under Section 1981 and the NYSHRL.  See Feingold, 366 F.3d at 158-59.  Stoupas is therefore also liable under the less demanding standards of the NYCHRL.  See Winston, 633 F.Supp.2d at 48.

## IV.    Sex Discrimination under Title VII, the NYSHRL and NYCHRL

Title VII and the NYSHRL also prohibit discrimination based on an individual's sex. See 42 U.S.C. § 2000e-2(a)(1); N.Y. Exec. Law. § 296(1)(a).  As with claims for racial discrimination, "[h]ostile work environment and retaliation claims under the NYSHRL are generally governed by the same standards as federal claims under Title VII." Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 609 (2d Cir. 2006); see Setty v. Synergy Fitness, 17-CV-06504 (NGG) (SMG), 2018 WL 8415414, at *4 (E.D.N.Y. Dec. 18, 2018), adopted, 2019 WL 1292431

---

[5] See, e.g., Compl. ¶ 101 (Second Cause of Action, under Section 1981, alleges that Stoupas "was personally involved in such discrimination, and directly participated in the unlawful discriminatory conduct"); id. ¶ 117 (Fourth Cause of Action, for race and sex discrimination under the NYSHRL, alleges that Stoupas "aided and abetted Angels [of the World] in its unlawful discriminatory acts"); id. ¶ 131 (same conclusory allegation of aiding and abetting in Sixth Cause of Action, for discrimination under the NYCHRL).

(E.D.N.Y. Mar. 21, 2019).   Accordingly, plaintiff's Title VII and NYSHRL sex discrimination claims may be analyzed together.   See Schiano, 445 F.3d at 609.

Sexual harassment prohibited by Title VII and the NYSHRL falls within two categories: quid pro quo sexual harassment and hostile work environment.   See Tenecora, 2020 WL 8771256, at *9; Cavalotti v. Daddyo's BBQ, Inc., 15 Civ. 6469 (PKC) (VMS), 2018 WL 5456654, at *20 (E.D.N.Y. Sept. 8, 2018).   Quid pro quo sexual harassment involves situations in which "submission to or rejection of [unwelcome sexual] conduct by an individual is used as the basis for employment decisions affecting such individual."   Tenecora, 2020 WL 8771256, at *9 (quoting Crosby v. Homeowner Assistance Servs. of New York, No. 14-CV-3459, 2015 WL 3466855, at *2 (E.D.N.Y. Feb. 18, 2015), adopted, 2015 WL 3468606 (E.D.N.Y. June 1, 2015)).   In connection with a hostile work environment theory, a plaintiff must show that "the harassment was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"   Terry v. Ashcroft, 336 F.3d 128, 147-48 (2d Cir. 2003) (quoting Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002)); see Cavalotti, 2018 WL 5456654, at *20 (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)).   Plaintiff alleges sexual harassment under both legal theories.

A.    *Sex-Based Hostile Work Environment (Federal and State Claims)*

Plaintiff contends that defendants subjected her to severe sexual harassment, constituting a hostile work environment.

"'The kinds of workplace conduct that may be actionable under Title VII . . . include "unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature."'"   Redd v. New York Div. of Parole, 678 F.3d 166, 175 (2d Cir. 2012) (quoting Meritor, 477 U.S. at 65).   Moreover, a corporation "is presumptively liable for sexual harassment

16

in violation of Title VII if the plaintiff was harassed . . . by someone with supervisory . . . authority over the plaintiff."  Redd, 678 F.3d at 182.

Plaintiff alleges that managers and promoters, all of whom who were male, and who "exercised managerial/supervisory authority over Entertainers," Compl. ¶ 36 n.2, "regularly targeted Entertainers with discriminatory, offensive, and sexually harassing behavior[,]" id. ¶ 37. For example, they " regularly [used] offensive and demeaning gender-based language, including, inter alia, "stupid bitch," "hoe," and "whore" when speaking with the Entertainers.  See id. ¶ 38. Plaintiff further alleges that managers and promoters "regularly and openly made flagrant, and offensive sexual advances towards Entertainers and Startenders, including unwanted sexual touching."  Id. ¶ 40.   In this regard, conduct that plaintiff witnessed, even if it was directed towards others, supports a claim that she was subjected to a hostile work environment.  See Kaytor v. Elec. Boat Corp., 609 F.3d 537, 547 (2d Cir. 2010) ("[A] plaintiff who herself experiences discriminatory harassment need not be the target of other instances of hostility in order for those incidents to support her claim.") (internal quotation marks and citation omitted).

In addition, several promoters "directly demanded that [p]laintiff have sex with them[,]" Compl. ¶ 48, including "[o]ne Promoter, known as 'Strike Sinatra,' [who] sexually harassed [p]laintiff on a regular basis by demanding sexual favors from her via phone and text message[,]" id. ¶ 47.   Defendant Stoupas also made sexually explicit comments and requests of plaintiff.  See id. ¶ 44.   The nature and frequency of the comments and conduct of the promoters and managers, as described in the pleading, were "severe or pervasive."   Based on the well-pled allegations in the Complaint, plaintiff has sufficiently alleged that her working conditions were such that a reasonable person would have found the abuse so severe and pervasive as to alter her working conditions. See, e.g., Tenecora, 2020 WL 8771256, at *10-11 (finding business owners' repeated graphic

sexual comments and propositioning of plaintiffs for sex-based hostile work environment); Gutierrez v. Taxi Club Mgmt., Inc., 17 Civ. 532 (AMD) (VMS), 2018 WL 3432786, at *4 (E.D.N.Y. June 25, 2018) (finding that supervisor's persistent sexual comments and advances were sufficient to state a claim for sexual harassment), adopted, 2018 WL 3429903 (E.D.N.Y. July 16, 2018); Setty, 2018 WL 8415414, at *5 (finding that manager's statements to plaintiff, such as "little cutie," a "bitch" and "faggit [sic]," were "demeaning in nature [and] clearly contributed to the hostile work environment"); Cavalotti, 2018 WL 5456654, at *21 (co-worker's "repeated sexual remarks and gestures toward [p]laintiff," which were reported to CEO); Manswell, 2017 WL 9487194, at *6 (finding that supervisor's comments about plaintiff's appearance and clothing and aggressive and explicit requests that plaintiff engage in sexual relations with him created a hostile work environment); Rodriguez v. Express World Wide, LLC, No. 12 CV 4572(RJD)(RML), 2014 WL 1347369, at *3 (E.D.N.Y. Jan. 16, 2014) (finding that CEO who instructed plaintiff to dress and act in a sexual manner while working, made numerous sexual advances to her, and indicated his intent to have a sexual relationship with her, created a hostile work environment), adopted, 2014 WL 1350350 (E.D.N.Y. Mar. 31, 2014); Joseph v. HDMJ Rest., Inc., 970 F.Supp.2d 131, 145 (E.D.N.Y. 2013) (finding that plaintiff established a hostile work environment when supervisor "constantly called [p]laintiff racially and sexually derogatory names and requested oral sex from [p]laintiff").

Moreover, not only was the conduct at issue in this case objectively severe and pervasive, but plaintiff alleges that she subjectively perceived it as hostile and abusive.  See Compl. ¶¶ 59-60; Declaration of Sylvia Quintero (July 21, 2021) ("Quintero Decl.") ¶¶ 10, 19-20, DE #39; see also Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 102 (2d Cir. 2010).

Because plaintiff has adequately pled a claim for hostile work environment against Angels of

the World under Title VII and the NYSHRL, she has also done so under the NYCHRL.  See
Antoine v. Brooklyn Maids 26, Inc., 489 F.Supp.3d 68, 84-85 (E.D.N.Y. 2020); Munson v.
Diamond, 15-CV-00425 (DAB) (BCM), 2017 WL 4863096, at *5 (S.D.N.Y. June 1, 2017) ("A
well-pled Title VII discrimination . . . claim [based on a hostile work environment] is sufficient to
support a corresponding claim under the NYSHRL, as well as under the NYCHRL, which provides
even broader protection than its federal and state counterparts.") (internal quotation marks and
citation omitted), adopted, 2017 WL 4862789 (S.D.N.Y. Oct. 26, 2017).

     B.    *Quid Pro Quo Harassment*

     "*Quid pro quo* sexual harassment occurs when submission to or rejection of improper or
unwelcome sexual conduct by an individual is used as the basis for employment decisions affecting
such individual."  Mejia v. City of New York, 17-CV-2696 (NGG) (JO), 2020 WL 2837008, at
*14 (E.D.N.Y. May 30, 2020) (internal quotation marks and citation omitted).  "The relevant
inquiry in a *quid pro quo* case is whether the supervisor has linked tangible job benefits to the
acceptance or rejection of sexual advances.  It is enough to show that the supervisor used the
employee's acceptance or rejection of his advances as the basis for a decision affecting the
compensation, terms, conditions or privileges of the employee's job."  Karibian v. Columbia
Univ., 14 F.3d 773, 778 (2d Cir. 1994); accord Perks v. Town of Huntington, 251 F.Supp.2d
1143, 1154–55 (E.D.N.Y. 2003); see Mejia, 2020 WL 2837008, at *14.  "Employers are strictly
liable for quid pro quo harassment committed by supervisors."  Perks, 251 F.Supp.2d at 1155.  To
make out a prima facie case of quid pro quo sexual harassment, "a plaintiff must present evidence
(1) that he was subject to unwelcome sexual conduct, and (2) that his reaction to that conduct was
then used as the basis for decisions affecting compensation, terms, conditions, or privileges of
employment."  Figueroa v. Johnson, 648 F.App'x 130, 135 (2d Cir. 2016).

19

In this case, plaintiff has stated a claim for quid pro quo sexual harassment. The number of shifts Entertainers and Startenders were permitted to work, the distribution of lucrative shifts, and the division of tips, were all "conditioned upon [the female employees'] capitulation to sexual advances by Managers and Promoters[,]" who exercised managerial/supervisory authority over plaintiff. Compl. ¶ 41. Specifically, as to plaintiff, defendant Stoupas began making sexually explicit comments and requests of plaintiff in 2017. See id. ¶ 44. "Promoters directly demanded that Plaintiff have sex with them[,]" including one promoter known as "Strike Sinatra," who "sexually harassed Plaintiff on a regular basis by demanding sexual favors from her via phone and text message." Id. ¶¶ 47-48. Because plaintiff did not submit to these unwanted sexual advances by managers, promoters and defendant Stoupas, "she received fewer and less lucrative shifts, and therefore less compensation." Id. ¶ 49. These conditions, among others discussed herein, made the "work atmosphere so intolerable that she was forced to quit." Id. ¶ 57. Based on plaintiff's allegations, the Court concludes that plaintiff has demonstrated a prima facie case of quid pro quo sexual harassment.

The Court now addresses the liability of each defendant for the two forms of sex discrimination alleged herein.

C.    *Employer and Individual Liability for Sexual Harassment*

1.    Title VII

Although "Title VII does not encompass individual liability[,]" Tenecora, 2020 WL 8771256, at *11 n.4, "[w]hen, as here, the alleged harasser is in a supervisory position over the plaintiff, the objectionable conduct is automatically imputed to the employer" under Title VII. Gorzynski, 596 F.3d at 103 (citations omitted); see Redd, 678 F.3d at 182. In fact, the employer is strictly liable if the harassment culminates in discharge of the employee. See Redd, 678 F.3d at

182.   Defendant Stoupas engaged in both forms of sexual harassment, as did the managers and promoters with supervisory authority over plaintiff, which resulted in plaintiff's constructive discharge.   Thus, their acts are properly imputed to Angels of the World.

### 2.   The NYSHRL

Under the NYSHRL, "'[a]n employer cannot be held liable for an employee's discriminatory act unless the employer became a party to it by encouraging, condoning, or approving it.'"   Romero v. City of N.Y., 839 F.Supp.2d 588, 635 (E.D.N.Y. 2012) (quoting Doe v. State, 89 A.D.3d 787, 788, 933 N.Y.S.2d 688 (2d Dep't 2011)).   Here, plaintiff alleges that defendants "permitted and encouraged an environment of severe and pervasive sexual harassment of employees by Managers and Promoters," Compl. ¶ 36, and plaintiff herself was subjected to a hostile work environment and quid pro quo harassment with "the full knowledge and consent of all Defendants," id. ¶ 46.   The managers and promoters publicly used "offensive and demeaning gender-based language."   Id. ¶ 38.   In addition, they "regularly and openly made flagrant, and offensive sexual advances" towards Entertainers and Startenders, including "unwanted sexual touching."   Id. ¶ 40.   Defendant Stoupas, alleged to have managed the club's day-to-day operations, "frequently directed Entertainers and Startenders downstairs to his private office to engage in sexual activities with him."   Id. ¶ 42.   Under these facts, plaintiff has sufficiently alleged a basis to hold Angels of the World liable under the NYSHRL, along with defendant Stoupas, who is individually liable under the NYSHRL as one of the perpetrators of the sexual harassment.   See Feingold, 366 F.3d at 158-59; Perks, 251 F.Supp.2d at 1160-61; N.Y. Exec. Law § 296(6).

### 3.   The NYCHRL

Similarly, employers who know or should have known of the offending employee's

21

discriminatory conduct may be held vicariously liable under the NYCHRL "for the unlawful harassment of employees by their supervisors or managers . . . ." Dillon, 85 F.Supp.3d at 658 (citing Zakrzewska v. New Sch., 14 N.Y.3d 469, 473, 476-77 (2010)).  Individual defendants may be held liable under Section 8-107(1)(a) of the NYCHRL "if they actually participated in the conduct giving rise to the discrimination claim." Dillon, 85 F.Supp.3d at 658.  Accepting the Complaint's well-pleaded allegations as true, the Court finds that plaintiff has demonstrated both Angels of the Worlds' employer liability and Stoupas' individual liability under the NYCHRL.  As one of the harassers, Stoupas is subject to direct individual liability under Section 8-107(1)(a) for actually participating in the discriminatory conduct.  See Drice v. My Merchant Servs., LLC, CV 2015-0395 (MKB) (MDG), 2016 WL 1266866, at *3 (E.D.N.Y. Mar. 4, 2016), adopted, 2016 WL 1266948 (E.D.N.Y. Mar. 31, 2016).  Moreover, because Stoupas, along with the other offending managers and promoters, exercised managerial or supervisory responsibility, liability may properly be imputed to Angels of the World.

## V.    Retaliation

The Complaint contains three causes of action alleging retaliation on the part of both defendants: the Third Cause of Action, which alleges retaliation under Section 1981, see Compl. ¶¶ 107-114; the Fifth Cause of Action, which alleges that defendants "improperly terminated [plaintiff's] employment on the basis of protected activities, in violation of the NYSHRL," id. ¶ 123; see id. ¶¶ 122-128; and the Seventh Cause of Action, which alleges that defendants "unlawfully retaliated against Plaintiff . . . and terminated her employment on the basis of sex, in violation of NYCHRL[,]" id. ¶ 137; see id. ¶¶ 136-142.  The Complaint does not include a claim for retaliation in violation of Title VII.  See generally Compl.

22

A.    *Retaliation Under Section 1981 and the NYSHRL*

To sustain a claim for unlawful retaliation under Section 1981 or the NYSHRL, a plaintiff must establish that: "(1) she participated in a protected activity known to the defendant; (2) the defendant took an employment action disadvantaging her; and (3) there exists a causal connection between the protected activity and the adverse action."   Patane, 508 F.3d at 115; see Setty, 2018 WL 8415414, at *9 (standards for retaliation claim are the same under Title VII and the NYSHRL); Francis, 2018 WL 4292171, at *7 ("Section 1981 encompasses claims of retaliation, and such claims are analyzed pursuant to Title VII principles.") (internal quotation marks and citation omitted).   Regarding the first element, the only protected activity described in the Complaint relates to plaintiff's protests regarding race discrimination at Angels of the World:   Starting in October 2017, plaintiff spoke out publicly about racially discriminatory treatment of the Entertainers, sharing her experiences on social media and submitting to interviews with journalists.   See Compl. ¶¶ 35, 50-57 & n.3.   Plaintiff's complaints regarding racial discrimination constituted protected activity.[6] See Sumner v. U.S. Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990) (holding that protected activity under Title VII includes "informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges"); see also Johnson v. Univ. of Cincinnati, 215 F.3d 561, 579-80 (6th Cir.

---

[6] The Third Cause of Action, for retaliation in violation of Section 1981, is, as a matter of law, limited to race-based retaliation.   The Fifth Cause of Action, for retaliation in violation of the NYSHRL, does not define the "protected activities" that allegedly generated the complained-of-retaliation.   See Compl. ¶ 123.   All of plaintiff's public disclosures about discriminatory treatment appear to relate to race discrimination.   See id. ¶¶ 35, 50-57 & n.3.   To the extent that the Complaint intended to charge retaliation for plaintiff's having resisted her supervisors' demands for sex, it is an open question in the Second Circuit as to whether rejecting a harasser's sexual advance constitutes "protected activity" for purposes of stating a retaliation claim.   See Williams v. New York City Dep't of Educ., 19 Civ. 1353 (CM), 2019 WL 4393546, at *11 (S.D.N.Y. Aug. 28, 2019) (collecting cases).

2000) ("the party to whom the complaint is made known" may include management, unions, co-workers, newspaper reporters, or "anyone else"); EEOC v. Crown Zellerbach Corp., 720 F.2d 1008, 1013-14 (9th Cir. 1983) (holding that employer violated Title VII when it imposed disciplinary suspension in retaliation for public protest letter).   In addition, plaintiff alleges facts from which a reasonable inference of her employer's knowledge of her protected activity could be drawn.   See Patane, 508 F.3d at 115.   On October 24, 2017, a promoter known as "King Keno" created an Instagram page entitled "dancersarefried," in which he and other employees posted intimidating and humiliating messages and photos and called for plaintiff's termination.   See Compl. ¶¶ 52-53.   On October 25, 2017, when plaintiff participated in a radio broadcast interview in which she discussed defendants' racist treatment of their employees, "Keno" called in "and continued his attacks against [p]laintiff on-air[,]" id. ¶¶ 54-55, making plaintiff fearful about returning to work, see id. ¶ 56.

As to the second element, plaintiff's constructive discharge constituted an employment action that disadvantaged her.   See, e.g., Lopez v. S.B. Thomas, Inc., 831 F.2d 1184, 1188 (2d Cir. 1987) (employer's statement that a plaintiff "would be fired . . . no matter what he did" held to be sufficient on its own to establish constructive discharge); Cronin v. St. Lawrence, No. 08–CV–6346 (KMK), 2009 WL 2391861, at *4 (S.D.N.Y. 2009) (denying a motion to dismiss retaliation claim where plaintiff alleged he resigned because he "did not feel that he had any alternative"); Borrero v. Am. Exp. Bank Ltd., 533 F.Supp.2d 429, 441 (S.D.N.Y. 2008) (holding that evidence suggested a constructive discharge where it showed that plaintiff reasonably believed her termination was a "foregone conclusion").   In addition, even before plaintiff's radio interview, defendants engaged in a campaign of harassment against plaintiff, intended to intimidate and humiliate plaintiff in retaliation for her complaints, rendering working conditions intolerable.   See Compl. ¶¶ 50-53,

24

56-57.

As to the final element, "[t]he causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." Cifra v. Gen. Elec. Co., 252 F.3d 205, 217 (2d Cir. 2001) (internal quotation marks and citation omitted); see Treglia v. Town of Manlius, 313 F.3d 713, 720 (2d Cir. 2002) ("We have held that a close temporal relationship between a plaintiff's participation in protected activity and an employer's adverse actions can be sufficient to establish causation."). Plaintiff alleges that because she spoke out on air about her employer's racially discriminatory treatment, she was "told [she] was unwelcome at the club moving forward[,]" Quintero Decl. ¶ 17, and plaintiff "was afraid to return to work[,]" Compl. ¶ 56. The temporal proximity of these events is sufficient to establish a causal link between them. See, e.g., Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 845 (2d Cir. 2013) ("The three-week period from [plaintiff's] complaint to her termination is sufficiently short to make a prima facie showing of causation indirectly through temporal proximity" for Title VII retaliation claim.); Cronin, 2009 WL 2391861, at *5 (denying motion to dismiss retaliation claim despite passage of eleven months between protected activity and constructive discharge); cf. Richardson v. N.Y. State Dep't of Corr. Servs., 180 F.3d 426, 447 (2d Cir. 1999) (affirming summary judgment for employer where two-year gap was too wide to support the inference that constructive discharge was in retaliation for complaining about discrimination); Agostinello v. Great Neck Union Free Sch. Dist., No. CV05–5838 (WDW), 2009 WL 238865, at *19 (E.D.N.Y. Feb. 2, 2009) (finding "insufficient temporal proximity between the alleged constructive discharge and the closest-in[-]time protected activity [one year earlier] to sustain the retaliation charge", aff'd, 353 F.App'x 589 (2d Cir. 2009). As plaintiff has established a prima facie case of retaliation, and in light of the defaulting defendants' failure to articulate a legitimate,

25

non-retaliatory reason for pressuring plaintiff to resign, she has stated a claim for retaliation under Section 1981 and the NYSHRL.

Defendant Stoupas is not individually liable for retaliation in violation of Section 1981[7] or the NYSHRL because plaintiff has not alleged, other than in conclusory aiding-and-abetting language, see Compl. ¶¶ 109, 124, that he "actually participate[d]" in the conduct giving rise to plaintiffs' retaliation claims.   Even in the context of a motion for default judgment, a pleading's conclusory assertions, unsupported by factual allegations, are not deemed to be admitted.   See Tenecora, 2020 WL 8771256, at *1 n.1, *15 n.6 ("[T]he court is 'limited to the non-conclusory, factual allegations' in the complaint.") (citation omitted); Antoine, 489 F.Supp.3d at 78; Manswell, 2017 WL 9487194, at *4.   Since the only individual identified by plaintiff as having responded to her public accusations by pressuring her to resign is a non-party promoter -- "King Keno" -- the Court recommends against finding defendant Stoupas individually liable for plaintiff's NYSHRL and Section 1981 retaliation claims.

B.      Retaliation under the NYCHRL

Plaintiff's retaliation claim under the NYCHRL alleges that plaintiff was retaliated against and terminated "on the basis of sex."   Compl. ¶ 138.   Although retaliation claims under the NYCHRL "are viewed under a broader interpretation than Title VII[,]" Russo, 972 F.Supp.2d at 455, the Complaint is devoid of allegations that plaintiff was forced to resign because she engaged in gender-related protected activity.   See supra p. 23 & n.6.   Therefore, the Court recommends that she be denied default judgment on her Seventh Cause of Action.

---

[7] "[P]ersonal liability under section 1981 must be predicated on the actor's personal involvement."   Patterson, 375 F.3d at 229 (citation omitted).

## VI.    Damages

Plaintiff has failed to specify the amount of damages she seeks either for lost earnings or emotional distress.

Violations of Title VII and the NYSHRL "entitle a plaintiff to compensatory damages for pecuniary loss as well as pain and suffering." Moore v. Houlihan's Rest., Inc., No. 07-CV-3129 (ENV)(RER), 2011 WL 2470023, at *4 (E.D.N.Y. May 10, 2011) (footnote omitted); see also Santiago v. Crown Heights Ctr. for Nursing and Rehab., 15 CV 4381 (DLI) (CLP), 2017 WL 9482107, at *23 (E.D.N.Y. Feb. 24, 2017) ("Courts have awarded damages for emotional distress under Title VII, Section 1981, the NYSHRL and the NYCHRL."), adopted as modified, 2017 WL 4410807 (E.D.N.Y. Sept. 30, 2017).    "Victims of employment discrimination are entitled to reasonable damages that would make the plaintiff 'whole for injuries suffered on account of unlawful employment discrimination.'" Moore, 2011 WL 2470023, at *4 (quoting Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 54 (2d Cir. 1988)).    Section 1981 likewise provides for awards of compensatory and punitive damages for race-based discrimination. See Johnson v. Railway Express Agency, 421 U.S. 454, 459-60 (1975).

### A.    *Back Pay*

When a defendant has violated Title VII, a court may award back pay, 42 U.S.C. § 2000e–5(g)(1), and such an award "is the rule, not the exception[,]" Carrero v. N.Y. City Housing Auth., 890 F.2d 569, 580 (2d Cir. 1989).    Back pay is also available under Section 1981, the NYSHRL and the NYCHRL. See Tomka, 66 F.3d at 1316 ("§ 1981 permits unlimited backpay"); Garcia v. Comprehensive Ctr., LLC, 17-CV-8970 (JPO) (BCM), 2019 WL 8274296, at *5 (S.D.N.Y. Nov. 21, 2019), adopted, 2020 WL 1435002 (S.D.N.Y. Mar. 24, 2020); Manswell, 2017 WL 9487194, at *15; N.Y.C. Admin. Code § 8–502(a).    The purpose of a back-pay award is to "make persons

whole for injuries suffered through past discrimination[.]"   Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1183 (2d Cir. 1996) (citation omitted).   Back pay is calculated from the date of the discriminatory practice to the date of entry of judgment.   See Sands v. Runyon, 28 F.3d 1323, 1327 (2d Cir. 1994).

Although plaintiff has not articulated the amount sought, she avers that in 2015, prior to the onset of defendants' racially discriminatory conduct, she earned approximately $3,000 per week, or $144,000 per year, working for defendants.[8]   See Quintero Decl. ¶ 4.   In 2016, after the commencement of the discriminatory conduct, plaintiff earned $38,400 from dancing at Angels of the World, and although she "tried to get work at other clubs," racial discrimination against African-American dancers "was an industry-wide practice at the time[.]"   Id. ¶ 8.   In 2017, the year that her employment ended after less than ten months, plaintiff earned approximately $50,000 at Angels of the World.   See id. ¶ 13.   Plaintiff has not provided any information about her earnings beyond 2017 or how long she was out of work following her termination.   Plaintiff avers that she was "forc[ed] to travel back and forth out of state to pursue comparable employment," Quintero Decl. ¶ 18, but proffers no further information regarding her efforts or her period of unemployment.

An employee who is discharged in violation of Title VII has an obligation to attempt to mitigate damages by using reasonable diligence in finding other employment.   See Bergerson v. N.Y. State Office of Mental Health, Cent. N.Y. Psychiatric Ctr., 526 F.App'x 109, 111 (2d Cir. 2013).   Typically, back pay is calculated as "the wages the employee would have earned from the

---

[8] The Court is constrained to note that counsel's affirmation wildly overstated the amount of plaintiff's earnings ($8,000 per week) prior to the alleged discriminatory conduct.   See Crumiller Aff. ¶ 23.

date of discharge to the date of reinstatement, along with lost fringe benefits such as vacation pay and pension benefits[.]"  United States v. Burke, 504 U.S. 229, 239 (1992); Noel v. N.Y. State Office of Mental Health , Cent. N.Y. Psychiatric Ctr., 697 F.3d 209, 213 (2d Cir. 2012).  Where, as here, reinstatement is not requested, the plaintiff's entitlement to back pay is generally reduced or eliminated when she obtains, or could have obtained, employment elsewhere.  See Greenway, 143 F.3d at 54 (vacating award of back pay, among other damages, for failure to mitigate).  Absent any particularized information concerning plaintiff's unemployment following her constructive discharge, the Court cannot recommend an award of back pay damages for the period postdating plaintiff's employment with Angels of the World.[9]  See Munson, 2017 WL 4863096, at *8 (in denying back-pay award in connection with motion for default judgment, court notes that plaintiff did not "make any showing as to her employment search or history after her constructive discharge[,]" making it "impossible for the Court to calculate the amount of any back pay to which she could be entitled"); Drice, 2016 WL 1266866, at *6 (on motion for default judgment, denying back-pay award for period of time for which plaintiff had not submitted any evidence that she was unemployed); Moore, 2011 WL 2470023, at *5-6 (on motion for default judgment, limiting plaintiff's back-pay award for period during which plaintiff chose to return to school and failed to demonstrate that he "adequately mitigate[d] his damages").

Accordingly, based on the sparse information in the record, this Court recommends an award of pre-termination back pay[10] as follows:  for 2016, $105,600 - the difference between

---

[9] Even assuming, in the absence of contrary evidence from defendants, that plaintiff was reasonably diligent in her search for new employment, see Garcia, 2019 WL 8274296, at *6 n.3, she has submitted no evidence specifying how long she was unemployed following her constructive discharge.

[10] Back-pay awards include lost tips.  See Joseph, 970 F.Supp.2d at 150.

$144,000 (what she earned in 2015 before the onset of the discriminatory conduct) and $38,400 (the amount she made in 2016); and, for 2017, $78,333.33 - the difference between $144,000 and the amount she made ($50,000) in 2017, prorated to account for her having worked only 10 months in 2017.

B.    *Front Pay*

"Front pay is awarded at the discretion of a district court where reinstatement is inappropriate and the plaintiff has been unable to find another job.   The purpose of front pay is to make victims of discrimination whole in cases where the factfinder can reasonably predict that the plaintiff has no reasonable prospect of obtaining comparable alternative employment." Bergerson v. N.Y. State Office of Mental Health , Cent. N.Y. Psychiatric Ctr., 652 F.3d 277,  286 (2d Cir. 2011) (internal quotation marks and citations omitted).   Such compensation, while available, is not mandatory, and whether to award front pay is within the court's discretion.   See Vernon v. Port Auth. of N.Y. & N.J., 220 F.Supp.2d 223, 236 (S.D.N.Y. 2002).   Furthermore, "an award of front pay cannot be unduly speculative." Dunlap–McCuller v. Riese Org., 980 F.2d 153, 159 (2d Cir. 1992).

Here, the Court concludes that the back pay award adequately redresses the loss that plaintiff is reasonably likely to have suffered.   See generally Chisholm v. Mem'l Sloane–Kettering Cancer Ctr., 824 F.Supp.2d 573, 577–78 (S.D.N.Y. 2011).   Furthermore, before being awarded front pay, "a claimant is required to 'use reasonable diligence in finding other suitable employment.'" Padilla v. Metro–North Commuter R.R., 92 F.3d 117, 125 (2d Cir. 1996) (emphasis omitted) (quoting Ford Motor Co. v. EEOC, 458 U.S. 219, 231 (1982)).   Here again, plaintiff proffered no evidence of any ongoing attempts to secure employment.   Absent evidence of plaintiff's efforts to find comparable work, and how long she remained unemployed, an award of

30

front pay would be unduly speculative.    Therefore, the Court respectfully recommends that front pay be denied.

      C.    *Emotional Distress*

      Despite this Court's invitation for her to do so, plaintiff has not articulated the amount sought for emotional distress damages.    See 7/7/21 Scheduling Order.

      "The Second Circuit sorts emotional distress claims into three categories of claims: 'garden-variety,' 'significant' or 'egregious.'"    Cavalotti, 2018 WL 5456654, at *27 (quoting Rainone v. Potter, 388 F.Supp.2d 120, 122 (E.D.N.Y. 2005)).    "'Garden variety' emotional distress claims lacking extraordinary circumstances and without medical corroboration generally merit $5,000 to $35,000 awards."    Munson, 2017 WL 4863096 at *8 (internal quotation marks omitted); see Antoine, 489 F.Supp.3d at 96 ("For 'garden-variety' emotional distress claims, where plaintiff 'did not seek medical treatment but [ ] the evidence in the form of plaintiff's testimony describes shock, nightmares, sleeplessness, humiliation, and other subjective distress,' courts have awarded damages ranging from $5,000 to $35,000.") (citations omitted); Tenecora, 2020 WL 8771256, at *19. "Significant" emotional distress claims typically involve "substantial harm that is often corroborated by witnesses or is evidenced by medical documents" and "damages for this type of claim range from $50,000 to $100,000."    Francis, 2018 WL 4292171 at *10.    Finally, "[e]gregious emotional distress claims justifying awards exceeding $100,000 have only been warranted where the discriminatory conduct was outrageous and shocking or where the physical health of plaintiff was significantly affected."    Cavalotti, 2018 WL 5456654 at *27 (internal quotation marks and citation omitted).

      When awarding compensatory damages, "[i]mportant factors in assessing an appropriate amount to award for emotional suffering include the amount, duration, and

consequences of the claimant's emotional distress." Cavalotti, 2018 WL 5456654, at *27 (quoting

Munson, 2017 WL 4863096, at *8) (internal quotation marks omitted); Tenecora, 2020 WL

8771256, at *19.

Plaintiff avers that defendants' conduct caused "substantial emotional distress,

. . . including intense stress and anxiety, as well as significant physical manifestations including

insomnia and weight loss of approximately 30 pounds." Quintero Decl. ¶ 19. While plaintiff's

allegations of emotional distress are significant, she has not supported those claims with any medical

or mental health records nor alleged that she treated with any medical provider. Moreover,

plaintiff's affidavit does not address the duration of her emotional distress. In the absence of any

corroborating evidence regarding plaintiff's mental health injuries that would support a more

significant award of damages for emotional distress, the Court finds that an award of $30,000 is

reasonable to compensate plaintiff for her emotional distress claim and is consistent with awards to

plaintiffs who suffered similar injuries.[11] See Tenecora, 2020 WL 8771256, at *20-24 (awarding

plaintiffs emotional damages for sexual harassment ranging from $4,00-$40,000); Setty, 2018 WL

8415414, at *18 (recommending award of $35,000 where plaintiff stated that the harassment made

him feel "humiliated," hurt his relationship with his girlfriend and family, and "took away [his]

---

[11] Under Title VII, there is a limitation on awards depending on the size of the employer. See, e.g., Luciano v. Olsten Corp., 110 F.3d 210, 220-21 (2d Cir. 1997); Holness v. Nat'l Mobile Television, Inc., No. 09 CV 2601 (KAM)(RML), 2012 WL 1744847, at *6 n.14 (E.D.N.Y. Feb. 14, 2012) ("Title VII sets caps on punitive and compensatory damages to reflect the size of the employer whose misconduct is to be punished.") (citing 42 U.S.C. § 1981a(b)(3)(A) -(D)), adopted as modified, 2012 WL 1744744 (E.D.N.Y. May 15, 2012); Walia v. Vivek Purmasir & Assocs., Inc., 160 F.Supp.2d 380, 389 (E.D.N.Y. 2000) (noting that the amount of compensatory damages for a respondent who has more than 14 but fewer than 101 employees shall not exceed $50,000) (citing 42 U.S.C. § 1981a(b)(3)(A)). However, where Title VII claims are pled alongside Section 1981 and NYCHRL claims, courts have awarded damages in excess of the Title VII statutory cap since those statutes impose no limit on the amount of compensatory or punitive damages a court may award See Manswell, 2017 WL 4075180, at *2 n.3 (collecting authorities); Rodriguez, 2014 WL 1347369, at *6 n.4; Caravantes v. 53rd Street Partners, LLC, No. 09 Cv. 7821(RPP), 2012 WL 3631276, at *21 (S.D.N.Y. Aug. 23, 2012) (citations omitted); Kauffman v. Maxim Healthcare Servs., Inc., 509 F.Supp.2d 210, 220 (E.D.N.Y. 2007). While the NYSHRL does not provide for punitive damages, it does not limit compensatory damages in employment discrimination cases. See Manswell, 2017 WL 4075180, at *2 n.3 (citing N.Y. Exec. Law § 297(9)).

dignity," but where he submitted no medical or mental health records showing he sought treatment nor any corroborating evidence); Santiago, 2017 WL 9482107, at *23 (plaintiff's statement that he experienced "anxiety, stress, shame and embarrassment, and loss of self worth," supported an award for emotional distress damages in the amount of $30,000 even though plaintiff did not seek treatment from any medical provider); Munson, 2017 WL 4863096, at *8 (awarding $15,000 for emotional distress damages where plaintiff submitted an affidavit in which she attested to feeling "intimidated, abused, anxious, and physically ill" as a result of the defendant's sexual harassment, but "fail[ed] to provide any medical records, any corroborating evidence"); Drice, 2016 WL 1266866, at *7 (awarding $20,000 for emotional distress based on plaintiff's testimony that she "felt then, and still continue[s] to feel offended, disturbed, and humiliated" and "suffered and continue[s] to suffer from severe anxiety and depression" due to defendant's sexual harassment within short period of employment); Joseph, 970 F.Supp.2d at 154 (awarding $30,000 for emotional distress damages after approximately two years of continuing discriminatory and abusive treatment); cf. Becerril v. E. Bronx NAACP Child Dev. Ctr., No. 08 Civ. 10283(PAC)(KNF), 2009 WL 2611950, at *2, *6 (S.D.N.Y. Aug. 18, 2009), adopted, 2009 WL 2972992, at *2-3 (S.D.N.Y. Sept. 17, 2009) (awarding $50,000 for emotional distress where plaintiff was prescribed three medications, diagnosed with depression, and suffered migraines and post-concussive syndrome).

D.    *Interest*

Plaintiff also requests prejudgment interest on her damages award.    See Crumiller Aff.

¶ 21.    To the extent the damages awarded to plaintiff represent compensation for lost wages, "it is ordinarily an abuse of discretion not to include pre-judgment interest."    Gierlinger v. Gleason, 160 F.3d 858, 873 (2d Cir. 1998) (internal quotation marks and citation omitted).    An award of prejudgment interest on plaintiff's back pay award is appropriate here, "because it serves to

33

compensate the plaintiff for loss of the use of money wrongfully withheld" due to defendants'

discrimination.  Thomas v. iStar Fin. Inc., 508 F.Supp.2d 252, 264 (S.D.N.Y. 2007) (citation

omitted).   Although courts have the discretion to determine the appropriate rate of pre-judgment

interest in a back-pay award, see McIntosh v. Irving Trust Co., 873 F.Supp. 872, 882 (S.D.N.Y.

1995), where "a judgment is based on violations of both federal and state law, courts in this circuit

uniformly have applied a federal interest rate, most commonly based on the average rate of return

on one-year Treasury bills ('T-bills') for the relevant time period."   Rodriguez, 2014 WL 1347369,

at *7 (quoting Thomas, 508 F.Supp.2d at 264); see Antoine, 489 F.Supp.3d at 94; Drice, 2016 WL

1266866, at *7.   As plaintiff's claim arose under both federal and state laws, the Court therefore

respectfully recommends that plaintiff be awarded prejudgment interest compounded annually on her

back-pay award at this rate.   See Villalta v. JS Barkats, P.L.L.C., 16-CV-2772 (RA) (RWL), 2021

WL 2458699, at *13 & n.11 (S.D.N.Y. Apr. 16, 2021), adopted, 2021 WL 2458023 (S.D.N.Y.

June 16, 2021); Joseph, 970 F.Supp.2d at 152.   The Court further recommends that interest be

calculated from November 12, 2016 - the mid-point of the period between December 1, 2015 (when

the discriminatory conduct began) and October 25, 2017 (the date of constructive discharge) - until

the entry of judgment.   See Villalta, 2021 WL 2458699, at *13 n.11; Manswell, 2017 WL

9487194, at *16.

   "Under Title VII, it is in a court's discretion to grant prejudgment interest on awards for

pain and suffering and emotional distress, but courts have declined to do so when it is unnecessary

to make the plaintiff whole."   Reiter v. Metro. Transp. Auth. of N.Y., 01 Civ. 2762(JGK), 2003

WL 22271223, at *15 (S.D.N.Y. Sept. 30, 2003) (citations omitted).   In this case, the Court has

"set the amount of compensatory damages at the reasonable amount to make plaintiff whole, and,

therefore, prejudgment interest [on the emotional damages award] is unnecessary."   Id.; see Drice,

2016 WL 1266866, at *7.

E.    *Punitive Damages*

Plaintiff seeks punitive damages in an unspecified amount.   See Crumiller Decl. ¶ 21.
Although plaintiff's submissions do not identify which discriminatory conduct merits punitive
damages, based on the nature of plaintiff's allegations, the Court infers that plaintiff's request for
punitive damages is based on her allegations concerning sexual harassment, rather than disparate
treatment because of race; disparate treatment claims, without more, are less likely to result in
awards of punitive damages.   See Becerril, 2009 WL 2972992, at *3 (finding that defendant's
behavior is "evidence of intentional discrimination; but that behavior is not evidence that the
[defendant] intentionally acted in violation of federal law"); see also Weissman v. Dawn Joy
Fashions, Inc., 214 F.3d 224, 236 (2d Cir. 2000) (finding that evidence "supports a finding of
discrimination, [but] does not support a finding that [the defendant] discriminated 'in the face of a
perceived risk that its actions [would] violate federal law'") (quoting Kolstad v. Am. Dental Ass'n,
527 U.S. 526, 536 (1999)).

Although the NYSHRL does not provide for punitive damages, see Farias v. Instructional
Sys., Inc., 259 F.3d 91, 101 (2d Cir. 2001), such damages are available under Title VII, Section
1981 and the NYCHRL, see 42 U.S.C. § 1981a(b)(1) (authorizing punitive damages under Title
VII, except against "a government, government agency or political subdivision"); Luciano v. Olsten
Corp., 110 F.3d 210, 220-21 (2d Cir. 1997); Tenecora, 2020 WL 8771256, at *25 (punitive
"damages are available under Title VII and Section 1981"); Antoine, 489 F.Supp.3d at 101 ("The
NYCHRL, on the other hand, imposes no limit on the amount of punitive damages a court may
award."); Norris v. N.Y. City Coll. of Tech., No. 07-CV-853, 2009 WL 82556, at *5 (E.D.N.Y.
Jan. 14, 2009).

Under Title VII, a plaintiff may recover punitive damages if she demonstrates that the defendant "engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1); see Kolstad, 527 U.S. at 536 (punitive damages are appropriate only "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others") (internal quotation marks and citation omitted); Zimmermann v. Assocs. First Cap. Corp., 251 F.3d 376, 384 (2d Cir. 2001). "The terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." Kolstad, 527 U.S. at 535. "A plaintiff seeking punitive damages under Title VII must present evidence that "(1) the employer discriminated (or retaliated) against him with conscious knowledge it was violating the law, *or* (2) that it engaged in egregious or outrageous conduct from which an inference of malice or reckless indifference could be drawn." Manswell, 2017 WL 9487194, at *19 (citation omitted).

The Supreme Court has delineated several factors for courts to consider in assessing the reasonableness of punitive damages, including: "(1) the degree of reprehensibility of the defendant's conduct; (2) the difference between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded and the civil penalties imposed in comparable cases." Antoine, 489 F.Supp.3d at 101 (citing DeCurtis v. Upward Bound Int'l, Inc., No. 09 Civ. 5378(RJS), 2011 WL 4549412, at *5 (S.D.N.Y. Sept. 27, 2011)); see BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 575 (1996). However, "[a]wards of punitive damages are by nature speculative, arbitrary approximations. No objective standard exists that justifies the award of one amount, as opposed to another, to punish a tortfeasor appropriately

36

for his misconduct." Payne v. Jones, 711 F.3d 85, 93 (2d Cir. 2012).   The court must ensure that

awards for punitive damages are "fair, reasonable, predictable, and proportionate."  Id.

A court is also required to consider the defendant's financial circumstances in determining

an award of punitive damages, no matter how egregious the underlying conduct.  Antoine, 489

F.Supp.3d at 101 (citing Patterson v. Balsamico, 440 F.3d 104, 121-22 (2d Cir. 2006)).

Moreover, where, as here, liability for punitive damages is sought to be imposed upon an employer

for malicious or recklessly indifferent discrimination by its agents, the plaintiff must demonstrate

that the "employee serving in a 'managerial capacity' committed the wrong while 'acting in the

scope of his employment,' unless the agent's 'discriminatory employment decisions . . . [were]

contrary to the employer's good-faith efforts to comply with Title VII."  Zimmermann, 251 F.3d at

384–85 (quoting Kolstad, 527 U.S. at 545) (internal citation omitted).

The Court finds that defendants' conduct towards plaintiff was egregious enough or

sufficiently outrageous to warrant punitive damages based on comparable caselaw.   Generally,

punitive damages are awarded for sex- or race-based Title VII claims when a plaintiff is subject to

repeated and aggressive propositions and comments.  See, e.g., Tenecora, 2020 WL 8771256, at

*27 (collecting cases); Manswell, 2017 WL 9487194, at *1-3, *19 (awarding an aggregate of

$100,000 in punitive damages against two sets of defendants where harasser repeatedly and

aggressively propositioned plaintiff for sex and made crude comments over an 18-month period,

after which plaintiff was retaliated against).   Plaintiff alleges that defendant Stoupas "continuously

sexually harassed" her, including making "sexually charged comments."   Quintero Decl. ¶¶ 9-10.

In addition, a club promoter demanded that she have sex with him on several occasions.   See id.

¶ 11.  Because plaintiff did not submit to unwanted sexual advances by managers, promoters and

defendant Stoupas, the terms and conditions of her employment were adversely effected.

Moreover, all of plaintiff's harassers were in a managerial position with respect to plaintiff.   Under these circumstances, an award of punitive damages is appropriate against the employer for the acts of its employees.   See Munson, 2017 WL 4863096, at *9 (holding employer liable for conduct of managerial agent, and noting that defaulting employer "cannot show that it made 'good-faith efforts to prevent discrimination in the workplace'").   Finally, the Court notes that, by defaulting, defendants have waived the opportunity to demonstrate that their financial circumstances should constrain the amount of any such award.   See Mathie v. Fries, 121 F.3d 808, 816 (2d Cir. 1997) ("Under well established precedent in this Circuit, 'it is the defendant's burden to show that his financial circumstances warrant a limitation of the award.'") (citation omitted).

In conclusion, the Court recommends an award of punitive damages against defendants jointly and severally in the amount of $15,000.[12]  See Tencora, 2020 WL 8771256, at *27 (awarding one of several plaintiffs $10,000 in punitive damages against defendant who "repeatedly propositioned her for sex, made sexually explicit comments to her, sent her inappropriate text messages, and contacted her outside of work with invitations to [his] home"); Munson, 2017 WL 4863096, at *9 (awarding $30,000 punitive damages for plaintiff who was repeatedly groped by co-worker); Styka v. My Merchants Servs. LLC, 14 Civ. 6198 (ENV) (VMS), 2016 WL 3866550, at *1, *4 (E.D.N.Y. July 13, 2016) (awarding $50,000 in punitive damages where supervisor made "crude verbal comments" and "physically forced himself on [the plaintiff] by kissing her or grabbing her breasts, thighs, or buttocks" for approximately five months, and terminated her); Walia, 160 F.Supp.2d at 384, 392 (awarding $30,000 in punitive damages based in part on

---

[12] Although Title VII permits an award of punitive damages only against the employer, the NYCHRL provides for punitive damages against an employer and an individual employee.   See Caravantes v. 53rd Street Partners, LLC, No. 09 Cv. 7821(RPP), 2012 WL 3631276, at *25 (S.D.N.Y. Aug. 23, 2012).

defendant's repeated grabbing of breasts of plaintiff, who suffered documented physical consequences and hospitalization).

## VII.    Post-Judgment Interest

Post-judgment interest shall be imposed "on any money judgment in a civil case recovered in a district court."  28 U.S.C. § 1961(a).  This interest rate is calculated "from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding[ ] the date of the judgment," and "shall be computed daily to the date of payment except as provided in section 2516(b) of this title and section 1304(b) of title 31, and shall be compounded annually."  28 U.S.C. § 1961(a)-(b).  The amount upon which the post-judgment interest accrues "includes compensatory damages, and punitive damages[.]"  Koch v. Greenberg, 14 F.Supp.3d 247, 287 (S.D.N.Y. 2014) (citations omitted).  Therefore, this Court respectfully recommends that plaintiff be awarded post-judgment interest on her monetary award, to be calculated using the federal rate set forth in 28 U.S.C. § 1961(a), from the date the Clerk of the Court enters judgment in this action until the date of payment.[13]

## CONCLUSION

For the foregoing reasons, this Court respectfully recommends that plaintiff's motion for default judgment be granted in substantial part and that plaintiff be awarded judgment against Angels of the World and defendant Stoupas, jointly and severally, in the amount of $228,933.33, plus pre-judgment interest on the back-pay award of $183,933.33, from November 12, 2016, until the entry of judgment, and post-judgment interest pursuant to 28 U.S.C. § 1961(a).  The Court

---

[13] Plaintiff has not moved for attorneys' fees and costs, nor submitted the requisite contemporaneous time records or documentation regarding the costs incurred.

further recommends that default judgment be denied as to plaintiff's retaliation claim brought under the NYCHRL (the Seventh Cause of Action) and the remaining retaliation claims against defendant Stoupas (contained in the Third and Fifth Causes of Action).

Any objections to this Report and Recommendation must be filed with Judge Gujarati on or before September 27, 2021.   Failure to file objections in a timely manner may waive a right to appeal the District Court order.   See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a)(1), 72(b)(2); Caidor v. Onondaga Cnty., 517 F.3d 601, 604 (2d Cir. 2008).

The Clerk is directed to mail copies of the Report and Recommendation to defendants at the following addresses: Angels of the World, Inc., 23 South Main Street, Freeport, NY 11520 and George Stoupas, 296 Oceanside Parkway, Oceanside, NY 11572.

**SO ORDERED.**

**Dated:    Brooklyn, New York**
**September 10, 2021**

/s/ *Roanne L. Mann*
_____
**ROANNE L. MANN**
**UNITED STATES MAGISTRATE JUDGE**